*In re* REVIEW OF CONSUMERS ENERGY COMPANY
RENEWABLE ENERGY PLAN

Docket No. 292659. Submitted May 11, 2011, at Lansing. Decided July 12,
2011, at 9:00 a.m. Amended, 293 Mich App 801. Leave to appeal
denied, 490 Mich 1001.

The Public Service Commission (PSC) opened two cases related to
the implementation of the Clean, Renewable, and Efficient Energy
Act, MCL 460.1001 *et seq.*, by Consumers Energy Company. Those
cases were subsequently consolidated by the PSC. In the consoli-
dated cases, Consumers Energy applied for approval of its energy-
optimization and renewable-energy plans as required by the act.
The Association of Businesses Advocating Tariff Equity (ABATE)
intervened, arguing that the PSC should not approve Consumers
Energy's renewable-energy plan because the viability and cost of
the plan was speculative and it included surcharges that would
result in revenues significantly exceeding costs in the early years
of the plan. ABATE further argued that natural gas transportation
customers, i.e., those customers who only purchase gas transpor-
tation services from the utility and not the commodity itself,
should be excluded from the energy-optimization plan. The PSC
approved Consumers Energy's renewable-energy plan but did not
approve any actual costs in the plan and noted that Consumers
Energy's costs would be subject to further review. The PSC also
reduced the initial surcharges to residential customers proposed in
the plan. The PSC approved Consumers Energy's proposed
energy-optimization plan charges. ABATE appealed.

The Court of Appeals *held*:

1. Under MCL 460.1089(1), a provider whose rates are regu-
lated is entitled to recover the actual costs of implementing its
approved energy-optimization plan. And under MCL 460.1089(2),
such costs shall be recovered from all natural gas customers. The
PSC's conclusion that natural gas transportation customers are
"natural gas customers" under MCL 460.1089(2) was not unlawful
or unreasonable given that it comported with the language of the
act and its purpose.

2. MCL 460.1093(1) provides that eligible electric customers
are exempt from charges that the customer would otherwise incur
under MCL 460.1089 and MCL 460.1091 if the customer files a

self-directed energy-optimization plan with its electric provider and implements the plan. The PSC correctly determined that the charges referenced in MCL 460.1093(1) are limited to the charges for electric service that would otherwise be applicable, and do not include the charges for the gas providers' optimization plans, given that the self-directed plan effectively replaces participation in the electric providers' optimization plans and because that interpretation otherwise comports with the language of the act.

3. ABATE failed to establish that the act's requirement that the PSC approve Consumers Energy's energy-optimization and renewable-energy plans within 90 days after the utility filed its application violated ABATE's right to due process and its right to a reasonable opportunity for a full and complete hearing. ABATE failed to offer any evidence that the time limit prejudiced it or its members.

4. ABATE failed to demonstrate that the PSC's approval of Consumers Energy's renewable-energy plan was unreasonable or unlawful in light of the statutory framework and the evidence presented to the PSC.

Affirmed.

1. PUBLIC UTILITIES — ENERGY-OPTIMIZATION PLANS — COST RECOVERY — NATURAL GAS CUSTOMERS.

Under the Clean, Renewable, and Efficient Energy Act, a provider whose rates are regulated is entitled to recover the actual costs of implementing its approved energy-optimization plan from all natural gas customers, including those customers who only purchase gas transportation services from the provider (MCL 460.1089).

2. PUBLIC UTILITIES — ENERGY-OPTIMIZATION PLANS — COST RECOVERY — EXEMPTION FOR ELIGIBLE ELECTRIC CUSTOMERS.

Eligible electric customers are exempt from charges that the customer would otherwise incur under the cost-recovery provisions of the Clean, Renewable, and Efficient Energy Act if the customer files a self-directed energy-optimization plan with its electric provider and implements the plan; the charges the customer would otherwise incur as part of the cost-recovery plan refers to the customer's electric-optimization plan costs (MCL 460.1093[1]).

*Clark Hill PLC* (by *Roderick S. Coy* and *Robert A. W. Strong*) for the Association of Businesses Advocating Tariff Equity.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, and *Steven D. Hughey* and *Kristin M. Smith*, Assistant Attorneys General, for the Public Service Commission.

*Jon R. Robinson* and *Raymond E. McQuillan* for Consumers Energy Company.

*Olson, Bzdok & Howard, P.C.* (by *Christopher M. Bzdok*), for the Michigan Environmental Council and the Natural Resources Defense Council.

Before: MARKEY, P.J., and FITZGERALD and SHAPIRO, JJ.

MARKEY, P.J. Appellant, the Association of Businesses Advocating Tariff Equity (ABATE), appeals by right a May 26, 2009, order of the Michigan Public Service Commission (PSC), issued in *In re Review of Consumers Energy Company Renewable Energy Plan* (PSC Case Nos. U-15805 and U-15889), approving the energy optimization (EO) plan and renewable energy (RE) plan submitted by Consumers Energy Company pursuant to Michigan's Clean, Renewable, and Efficient Energy Act, 2008 PA 295, MCL 460.1001 *et seq.* (the Act).[1] We affirm.

I. BACKGROUND

A. GENERAL PROVISIONS

The Act became effective on October 6, 2008. MCL 460.1191 provides that the PSC was to issue a temporary order implementing the Act within 60 days of its passage. Among the Act's other provisions, part 2(A)

---

[1] PSC Case No. U-15805 concerns Consumers Energy's EO and RE plans for its electric division, while PSC Case No. U-15889 concerns Consumers Energy's EO plan for its gas division.

requires regulated electric utilities to adopt "renewable energy plans" in which the electric companies are required to demonstrate how they will achieve compliance with the Act's requirements for obtaining electric capacity and energy production from "renewable energy resources" as defined in the Act. See MCL 460.1011(h) and (i); MCL 460.1021 to MCL 460.1053. The Act requires Consumers Energy to meet: (1) a standard for new renewable energy capacity, and (2) a standard for its renewable energy credit portfolio. MCL 460.1027. The renewable energy capacity standard for Consumers Energy is 500 megawatts (MW) by December 31, 2015.[2] MCL 460.1027(1)(a). The renewable energy credit portfolio standard will, by 2015, result in 10 percent of the total megawatt hours (MWh) sold to retail customers being obtained from renewable energy resources. MCL 460.1027(3) through (5). To meet their goals, companies may use and trade "renewable energy credits" (REC).[3] MCL 460.1011(d). Consumers Energy and other companies may build or own up to 50 percent of the renewable energy systems necessary to meet their REC requirements and are required to purchase at least 50 percent of their required RECs through power purchase agreements (PPAs) with independent energy developers. See MCL 460.1033(1)(a). Utilities are allowed to recover the cost of the renewable energy program in two ways. First, they will receive a price that represents what the same amount of energy would have cost (in MWh) had it been acquired from conventional sources through a proceeding similar to the utilities' general power supply cost recovery process. See MCL 460.1049(3)(c) and MCL 460.6j. Utilities will

---

[2] A megawatt is one million watts. A kilowatt (kW) is one thousand watts.

[3] One REC is equal to 1 MW of electricity generated from renewable energy. MCL 460.1039.

then pass on to their customers the rest of the cost of renewable energy through an "incremental cost of compliance" surcharge that represents the additional cost of complying with the renewable energy program. MCL 460.1011($l$). This surcharge is assessed on a per meter or "nonvolumetric mechanism" basis and is capped at $3 a month for residential customers, $16.58 a month for commercial customers and $187.50 a month for industrial customers. MCL 460.1021(3); MCL 460.1045. The surcharge will be assessed for the 20-year life of the program and can be front-loaded so that the utility can build up a balance from excess revenues during early years of the program and use that balance to fund revenue shortfalls during the program's later years. MCL 460.1047(3). The company's renewable energy plan, outlining how it will meet the REC requirements, the projected costs of doing so, and its proposed cost recovery mechanisms, including the transfer price and the 20-year levelized surcharge for the incremental cost of compliance, is reviewed through a contested case proceeding. The PSC cannot approve the plan unless it is reasonable and prudent and the company demonstrates that the incremental cost of developing clean energy sources—minus the energy saved in the company's energy optimization plan—is less, over the projected life cycle of the source, than the incremental cost of developing new coal-fired power plants. MCL 460.1021(6).

Part 2(B) of the Act requires, among other things, that regulated electric and natural gas providers adopt "energy optimization" plans. MCL 460.1005(e). Broadly speaking, an energy optimization plan is designed to reduce the demand for energy and provide for load management, thereby reducing the future costs of providing service to customers, "[i]n particular . . . to delay the need for constructing new electric generating facili-

ties and thereby protect consumers from incurring the costs of such construction." MCL 460.1071(2). See also MCL 460.1001(2). Combination utilities, such as Consumers Energy, are to adopt both electric and natural gas energy optimization plans. The Act provides companies with the option of enacting their own energy optimization plans, with PSC approval, MCL 460.1071 to MCL 460.1089, or of turning to an "independent energy optimization program administrator," a nonprofit organization selected by the PSC through a competitive bid process. MCL 460.1091. Certain electric customers can also opt to enact a self-directed energy optimization plan. MCL 460.1093. Pertinent to this appeal, gas or electric companies are permitted to recover certain costs for the energy optimization plans from their customers, MCL 460.1089; MCL 460.1091, while electrical customers who have a self-directed plan would be exempt from some of the utilities' plan costs. MCL 460.1093(1).

### B. INSTANT CASES

After the enactment of the Act, the PSC conducted meetings and discussions on a proposed order and released its temporary order on December 4, 2008, followed by amendatory orders on December 23, 2008, and January 13, 2009. *In re Temporary Order to Implement 2008 PA 295* (PSC Case No. U-15800).[4] At the same time, to comply with the strict time limits placed on the PSC to complete the initial phases of the

---

[4] According to the temporary order, the temporary order was to last only for a year while the PSC promulgated administrative rules to administer the Act in *In re Rules Governing Renewable Energy Plans* (PSC Case No. U-15900). But to date, the PSC has only proposed a number of rules to administer the Act and is in the process of seeking public comment. *In re Rules Governing Renewable Energy Plans*, order entered April 27, 2010 (PSC Case No. U-15900).

implementation process, see MCL 460.1021; MCL 460.1073, the PSC opened cases for all rate regulated electric and natural gas distribution companies, including two for Consumers Energy.

While the two cases in the instant appeal began separately, they were subsequently consolidated at the request of Consumers Energy. Consumers Energy then filed a Notice of Intent to File Applications to seek review and approval of its energy optimization and renewable energy plans. Seventeen entities, including ABATE, the Michigan Environmental Council (MEC), the Natural Resources Defense Council (NRDC), the Michigan Cable Telecommunications Association, and the Michigan Sustainable Energy Coalition petitioned to intervene.[5] On February 17, 2009, Consumers Energy filed its application for approval of both plans.

With respect to its renewable energy plan, Consumers Energy proposed that to meet its goal that 10 percent of its retail sales consist of energy generation from qualifying renewable energy sources, see MCL 460.1027(3), it intended to add 200 MW of renewable energy capacity by the end of 2013, 500 MW of renewable energy capacity by the end of 2015, and 900 MW of renewable energy capacity by 2017. Consumers Energy planned that wind generation sources would provide most of the capacity and that it would build approximately half of its wind capacity (450 MW) itself and buy the other half through PPAs with other companies. Consumers Energy also proposed an experimental plan to partner with retail customers to derive some capacity

[5] Given this fact, we reject the challenge to ABATE's standing to dispute the rights of customers who choose to establish self-directed energy optimization plans. The PSC had discretion to allow intervention, Mich Admin Code, R 460.17201, and permitted ABATE's intervention without limitation, Mich Admin Code, R 460.17205.

from their wind and other renewable electricity generation systems. Consumers Energy estimated the cost of its plan at approximately $5.3 billion, with an offset of $3.5 billion for the transfer price. The remaining $1.8 billion for the incremental cost of compliance would be surcharged to Consumers Energy's customers over a 20-year period.

In addition to this proposal concerning its renewable energy plan, Consumers Energy presented its proposed energy optimization plan. With respect to the issues on appeal, Consumers Energy proposed various energy optimization plan surcharges for its different customer classes. Among other surcharges it sought to impose on customers for implementation of the plan was a surcharge of $0.1588/Mcf[6] on its natural gas "gas transportation only" customers[7] who used from zero to 100,000 Mcf the previous year, and a surcharge of $0.0053/Mcf for transportation only customers who used over 100,000 Mcf the previous year.

From April 13, 2009, to April 16, 2009, a hearing was conducted on Consumers Energy's application. For purposes of this appeal, the dispute with respect to Consumers Energy's renewable energy plan involves its projected costs of wind energy, in particular its proposal to build 450 MW of wind generation facilities. Consumers Energy presented the testimony of Thomas Swartz, a principal analyst in the company's Risk, Strategy, and

---

[6] Mcf refers to 1,000 cubic feet of natural gas.

[7] These customers are individuals and entities who purchase only transportation services from the gas utility, as opposed to customers who purchase both gas as a commodity and gas transportation (i.e., direct or gas cost recovery customers) from Consumers Energy. In its appellate brief, ABATE refers to these customers as "gas transportation only customers." No party uses the statute's nomenclature of "distribution customers," see MCL 460.1089(5), but we conclude that these terms are synonymous.

Financial Advisory Services group, concerning Consumers Energy's decision to build its own generation facilities. He testified that Consumers Energy had decided to do so for several reasons, including: (1) substantial savings that could be generated by "gaining economies of scale," providing the chance to negotiate favorable contracts for the purchase of turbines and other equipment, (2) to balance the risks of complying with the Act, in particular the availability and pricing risks of purchasing adequate capacity through PPAs with the development risks of building its own facilities, (3) to decrease the risk of REC unavailability through the purchasing of power from independent power companies because of the limited credit available or high interest rates that might prevent those companies from starting new projects, and (4) to provide competition for independent providers to pressure such providers to lower the prices of PPA contracts. Swartz also explained that while the company would not need the 400 MW of capacity planned for 2017 until 2022, it could sell the RECs to other companies and the accelerated development of capacity would create new jobs and benefit the landowners involved. Swartz further testified that the risks associated with Consumers Energy's development of its own capacity would include: (1) the ability to obtain sufficient land for construction, (2) the ability to obtain permits for construction, (3) the actual output from the proposed sites, (4) the potential for reduced availability of turbine and other equipment, especially if the needed equipment becomes scarcer as a result of increased demand caused by federal renewable energy policies, and (5) the ability to connect the new facilities to the existing infrastructure. Swartz explained what steps Consumers Energy was taking to address the risks, such as acquiring land, collecting wind data to

select the proper wind turbines, and hiring consultants to assist with the permit process and address other concerns.

Regarding the incremental cost of compliance predictions, Swartz testified that Consumers Energy projected the cost of building 450 MW of wind capacity at $2,500 a kW, that he expected the costs to increase three percent annually, and that the company would incur between $70,000 and $100,000 a year in operating and maintenance costs. Consumers Energy expected to recover its investment using a 20-year straight line depreciation rate. Swartz then provided details concerning how Consumers Energy arrived at the proposed costs listed in its accompanying summary of projected costs.

David Ronk, Jr., Director for Electric Transactions and Resource Planning for Consumers Energy, provided an overview of the company's projected needs for RECs and explained how the company planned to acquire them. He outlined the proposal to build generating facilities and to purchase power through PPAs and noted that Consumers Energy did not presently plan to purchase generating facilities established by other companies. He further testified that the company would sell surplus RECs at market price and use the proceeds to reduce the incremental cost of compliance. Ronk also testified about Consumers Energy's "life-cycle" cost comparison in $/MWh[8] between the proposed renewable energy generating facilities and that of a new coal-fired power plant. He maintained that when coupled with the

---

[8] The parties apparently agree that Consumers Energy's cost projection of $2,500 a kilowatt translates into a projected 20-year levelized cost of $174.20/MWh for power purchased under PPA agreements, and of $172/MWh for wind energy from the generators built by Consumers. Because the parties use the comparisons from other companies using $/MWh, we will use this terminology as well.

amount Consumers Energy calculated would be saved under its EO plan, the numbers were more favorable than the life-cycle cost of a new conventional coal-fired facility.[9] Ronk also provided alternative life-cycle calculations, which showed a savings of $232 million over building a new coal-fired facility. In his rebuttal testimony, Ronk defended the calculated 20-year cost of $174.20/MWh for purchased power, and stated that the lower costs estimated by other witnesses were unreasonable and understated the true cost of compliance. He further defended Consumers Energy's use of a 28 percent capacity factor for wind generation, provided the basis for this figure,[10] and maintained that this capacity was realistic for wind generation in Michigan. He recognized that other witnesses had advocated the use of higher—mid-30 percent—capacity factors, but stated that they had arrived at this figure by referring to data from multiple sites and regions outside of Michigan.

According to other witnesses, however, Consumers Energy's projected costs were too high. Among the concerns raised by MEC's witness was the alleged failure of Consumers Energy to account for possible reductions in costs resulting from economies of scale and that other companies such as Detroit Edison had proposed much lower 20-year levelized costs. He testified that a more appropriate 20-year levelized budget would be between $120/MWh and $124/MWh. ABATE's witness, James Selecky, testified that it was his opinion that the PSC should not approve Consumers Energy's

---

[9] Pamela G. Lesh, testifying on behalf of NRDC, stated that she agreed with this assertion and that the plan thus met the life-cycle test under MCL 460.1021(6)(b).

[10] Ronk testified that it was developed during a 2006-2007 collaborative sponsored by the PSC to develop a "Capacity Needs Forum Report and a 21st Century Michigan Energy Plan."

RE plan. He argued that Swartz's testimony showed that there existed "significant uncertainties as to the cost effectiveness of wind generation," including concern over the possible escalating cost of the equipment and engineering involved especially if demand rose as a result of the enactment of federal renewable energy requirements. He also expressed concern that the turbines could not provide system capacity at the time of system peak demand. He maintained that the PSC should have a separate hearing to evaluate the total cost to ratepayers of meeting the renewable requirements and recommended reducing the surcharges by 50 percent because Consumers Energy's plan was "speculative." He also argued for ABATE's position, set out further in their brief below, that the amount of early over-recovery Consumers Energy sought was unreasonable and amounted to an "exorbitant" low interest loan to Consumers Energy from its ratepayers in hard economic times.

PSC staff (Staff) witness Thomas Stanton testified that he recommended that the PSC approve Consumers Energy's renewable energy plan, albeit with modifications, on the basis that Staff had reviewed the plan and had not identified any reason for the PSC not to approve it. Staff instead recommended refinements to Consumers Energy's proposal for procuring energy power from smaller providers, including in the experimental program, to support small-scale production through the use of renewable energy pricing (REP) rather than the proposed "request for proposals" (RFP) bidding process. Staff also had concerns about some of the pricing, eligibility, and fees associated with Consumers Energy's experimental program and further recommended changes to Consumers Energy's transfer price for solar generated power.

In its subsequent brief, Staff agreed with Stanton's testimony and recommended that the PSC approve the plan with proposed changes. Germane to this appeal, Staff acknowledged that Consumers Energy's cost estimates were "likely" to prove too high. Staff agreed with Selecky's recommendation that the PSC explore the costs in a future case, but also stated that the PSC would have the opportunity to revisit this and other issues in the renewable cost reconciliation case, in Consumers Energy's next renewable energy plan case, or in a special-purpose case initiated by the PSC. Staff further recommended that the PSC adopt Consumers Energy's proposed renewable energy surcharges, stating that the goals of the Act are best served by collecting revenues at or near the maximum in the near term, and noting that Consumers Energy has forecast that in order to meet the statutory requirements, it needed to collect the maximum surcharge up front. In its reply brief, Staff noted that PSC approval of Consumers Energy's plan was not synonymous with approval of the costs associated with the plan's implementation and that the costs would be addressed in annual reconciliations and each time a contract to procure renewable energy was submitted for PSC approval.

In its opinion and order, after discussing the parties' objections and evidence, the PSC approved Consumers Energy's renewable energy plan, with modifications. As discussed further later in this opinion, it agreed with Staff that, while the plan was "flawed" and that the estimates for the cost of wind power "may be too high," the problems with the overall framework did not rise to the level that it should be considered unreasonable or imprudent. Among other requirements it imposed, the PSC made clear that, while it was approving the plan, it was "not approving any actual costs" and that all actual costs incurred either for PPAs or for self-generated

wind facilities would be subject to further PSC review for reasonableness and prudence. The PSC further agreed with the recommendation by Staff that a future case should be opened to track costs of various renewable energy systems and components to obtain information to help the PSC determine reasonable and prudent expenditures. In addition, the PSC reduced the initial surcharges to residential customers to $2.50 a month from the proposed $3 a month, finding the concerns about the size of Consumers Energy's reserve fund justified, and noting various other rate increases proposed by Consumers Energy and the difficult economic circumstances faced by Consumers Energy's ratepayers.

The PSC also approved Consumers Energy's proposed energy optimization plan charges.

### II. GAS TRANSPORTATION CUSTOMERS' INCLUSION IN CONSUMERS ENERGY'S ENERGY OPTIMIZATION PLANS

ABATE argues that the PSC erroneously interpreted the language of MCL 460.1089(2) to find that "gas transportation only customers" were "natural gas customers" subject to a surcharge to fund Consumers Energy's energy optimization plan.

As explained in *In re Application of Detroit Edison Co*, 276 Mich App 216, 224; 740 NW2d 685 (2007), rev'd in part 483 Mich 993 (2009):

> The standard of review for PSC orders is narrow and well-defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Public Service Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unrea-

sonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). And, of course, an order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Service Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966). In sum, a final order of the PSC must be authorized by law and supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Service Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

"An agency's interpretation of a statute, while entitled to 'respectful consideration,' 'is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue.' " *In re Application of Consumers Energy Co*, 281 Mich App 352, 357; 761 NW2d 346 (2008) (quotation marks omitted), quoting *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 93, 103; 754 NW2d 259 (2008).

With respect to this Court's review of the PSC's factual determinations:

Judicial review of administrative agency decisions must "not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views." *Employment Relations Comm v Detroit Symphony Orchestra*, 393 Mich 116, 124 [223 NW2d 283] (1974); see also *In re Payne*, 444 Mich 679, 692-693 [514 NW2d 121] (1994) ("When reviewing the decision of an administrative agency for substantial evidence, a court should accept the agency's findings of fact, if they are supported by that quantum of evidence. A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record."). [*In re Application of Detroit Edison Co*, 483 Mich 993 (2009).]

With regard to the question of whether natural gas transportation customers should not be subject to a surcharge to fund Consumers Energy's energy optimization plan, we find ABATE's arguments unpersuasive. Gas transportation customers are "natural gas customers" under MCL 460.1089(2). In resolving this issue we find persuasive and adopt this Court's previous analysis in *In re Temporary Order to Implement 2008 PA 295*, unpublished opinion per curiam of the Court of Appeals, issued October 14, 2010 (Docket No. 290640), pp 4-7:

> When interpreting statutory language, this Court's primary goal is to give effect to the intent of the Legislature. "The first step is to review the language of the statute. If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute." *Briggs Tax Serv, LLC v Detroit Pub Schools*, 485 Mich 69, 76; 780 NW2d 753 (2010) . . . . This Court accords to every word or phrase of a statute its plain and ordinary meaning, unless a term has a special, technical meaning, or is defined in the statute. *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999); *Stocker v Tri-Mount/Bay Harbor Bldg Co, Inc*, 268 Mich App 194, 199; 706 NW2d 878 (2005). See also MCL 8.3a; *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 189-190; 740 NW2d 678 (2007). Furthermore, statutory language is to be read in context, and "statutory provisions are *not* to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole." *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010) . . . .

> Under MCL 460.1089(1), a provider whose rates are regulated by the PSC is entitled to recover "the actual costs of implementing its approved energy optimization plan."[4] Pursuant to MCL 460.1089(2), the utility is entitled to recover those costs from customers:

> "Under subsection (1), costs shall be recovered from *all natural gas customers* and from residential electric customers by volumetric charges, from all other metered electric

customers by per-meter charges, and from unmetered electric customers by an appropriate charge, applied to utility bills as an itemized charge." [Emphasis added.]

In the instant case, ABATE argues that individuals and entities who purchase only "transportation services" from the gas utility, i.e. natural gas transportation customers, are not "natural gas customers" of the utility and thus cannot be assessed the surcharge to fund the gas distribution utilities' energy optimization plans which ABATE maintains the "transportation only customers" cannot use.

The phrase "natural gas customers" is not specifically defined in the Act. The PSC noted this, but found that the Legislature intended the definition to include transportation customers. It based its decision on the fact that gas transportation customers were not explicitly excluded or distinguished in MCL 460.1089(1), that the transportation customers would receive benefits from inclusion in the providers' energy optimization plans, that the additional provisions of the Act include the revenues generated by sales to transportation customers, and that inclusion of these customers was consistent with the stated goals of the energy optimization provisions of the Act, as well as the stated goals of the Act itself.

Reading MCL 460.1089(2) in context with the other subsections of that statute, and in connection with the remaining provisions of the Act and the stated purpose of the Act in MCL 460.1001(2), *Robinson*, 486 Mich at 15, we hold that the PSC correctly found that a portion of the natural gas providers' energy optimization plan costs could be charged back to the providers' gas transportation customers. Gas transportation customers take their service from the providers pursuant to PSC-approved terms and rate schedules. The services they are provided by the regulated utility are "natural gas" services. And in the absence of even an assertion to the contrary, we find no error in the PSC's finding that all of ABATE's members do purchase natural gas commodity, albeit from another provider. Thus, in light of the specific language that costs shall be recovered from *"all* natural gas customers" (emphasis added), the PSC's interpretation does not "conflict with the

Legislature's intent as expressed in the language of the statute at issue." *In re Application of Consumers Energy Co*, 281 Mich App at 357.

The language of MCL 460.1089(6), MCL 460.1089(7) and MCL 460.1091(1) provides further support for the PSC's decision. In pertinent part, MCL 460.1089(6) provides:

"The commission shall authorize a natural gas provider that spends a minimum of 0.5% *of total natural gas retail sales revenues, including natural gas commodity costs*, in a year on commission-approved energy optimization programs to implement a symmetrical revenue decoupling true-up mechanism that adjusts for sales volumes that are above or below the projected levels that were used to determine the revenue requirement authorized in the natural gas provider's most recent rate case." [Emphasis added.][11]

MCL 460.1089(7) provides in pertinent part:

"A natural gas provider or an electric provider shall not spend more than the following percentage of *total utility retail sales revenues, including electricity or natural gas commodity costs*, in any year to comply with the energy optimization performance standard without specific approval from the commission. . . ." [Emphasis added.]

Similarly, MCL 460.1091(1) provides that, except for MCL 460.1089(6), the requirements under MCL 460.1071 through MCL 460.1089 do not apply "to a provider that pays the following percentage of *total utility sales revenues, including electricity or natural gas commodity costs*, each year to an independent energy optimization program administrator selected by the commission. . ." (emphasis added).

We agree with the PSC's determination that these provisions support a finding that the Legislature intended to include natural gas transportation customers in the providers' energy optimization plans (either administered

---

[11] We recognize the parties' agreement that "natural gas commodity costs" represents sales of the physical natural gas itself.

internally or run by the PSC's program administrator) and to count the transportation revenues for purposes of determining the size of the plans and the ability to implement the true-up mechanism. ABATE argues that Consumers' reading of the statutes improperly renders "including natural gas commodity costs" or "including electricity or natural gas commodity costs" surplusage. However, it ignores the contrary argument that, if the Legislature intended the inclusion of only commodity costs, it would not have added the language concerning total sales, or total retail sales, revenue and that ABATE's interpretation would thus in turn improperly render this language surplusage. We do not find ABATE's argument persuasive. The language used in these sections indicates an intention by the Legislature that the provider is to include all of its utility sales revenues in its calculations.[5] Thus, the provider is to include the costs of the gas to direct customers, transportation sales to direct (or bundled) customers, and transportation sales to unbundled customers. While ABATE states that the question of what sales are to be included is not directly related to the question of which customers have to pay for the optimization plan costs, we disagree. The provider's costs are passed on to the customers under MCL 460.1089(2). And as ABATE repeatedly points out on appeal, an energy optimization plan is supposed to "[e]nsure, to the extent feasible, that charges collected from a particular customer rate class are spent on energy optimization programs for that rate class." MCL 460.1071(3)(d). Thus, when the provisions of the Act are viewed as a whole, the scope of an energy optimization plan is related to the Legislature's intention concerning which customers should be responsible for the costs of implementing the plan.[6]

MCL 460.1089(5) further supports a finding that the Legislature intended to include gas transportation customers in the phrase "all natural gas customers." That statute provides:

"The established funding level for low income residential programs shall be provided from each customer rate class in proportion to that customer rate class's funding of

the provider's total energy optimization programs. Charges shall be applied to distribution customers regardless of the source of their electricity or natural gas supply."

The inclusion of "distribution customers" in this subsection provides support for the PSC's conclusion that the Legislature was aware of the existence of gas transportation customers and intended them to be included in "all natural gas customers" in MCL 460.1089(2). In addition, this subsection further supports the PSC's interpretation because it ties the customers' funding of the low income residential programs in "proportion to that customer rate class's funding of the provider's total energy optimization programs." In other words, the distribution customers' funding responsibilities for low income residential programs are to be proportionate to the distribution customers' funding of the total energy optimization program. This indicates an intent by the Legislature that the distribution customers, or gas transportation customers, share funding responsibility for the provider's total energy optimization program, and are thus included as "all natural gas customers" for recovery of energy optimization plan surcharges.[7]

In addition, the PSC reasonably found that the inclusion of gas transportation customers in the energy optimization programs of their transportation providers would have results consistent with the intentions of the Act as stated in MCL 460.1001(2). While MCL 460.1071(2) describes the goals of the energy optimization portion of the Act primarily in terms of reduction of electric usage, and of reducing the need to build more electric generating facilities, ultimately the Act is designed to promote electrical and natural gas energy efficiency. See e.g. MCL 460.1071(3)(f) and (4)(a). While reducing the gas transportation customer's gas usage does not directly result in increased future service capacity for the transportation provider, it could have the effect of increasing the future service capacity of the provider who sells the transportation customer its natural gas. These presumably could include municipal providers, who are not subject to regulation by the PSC. See MCL 460.6. A demand reduction in one of ABATE's member companies results in an increased ability for such

a utility to meet customer's [sic] future demands without investment in costly infrastructure. This is at least consistent with the goal of MCL 460.1001(2)(b) to provide greater energy security through the use of indigenous energy resources. This finding refutes ABATE's implicit argument that the natural gas transportation customers' gas usage is not relevant to the goals of the Act or of the creation of energy optimization plans.

For the above reasons, we hold that ABATE has not shown that the PSC's decision that natural gas transportation customers are responsible for energy optimization plan costs under MCL 460.1089(2) is unlawful or unreasonable.

---

[4] Some caveats apply for costs that exceed the overall funding levels specified in the plan, and "costs for load management" are not recoverable under this section.

[5] While the Act does not define "retail" sale, ABATE does not argue that a sale of transportation services does not constitute a retail sale, nor does it explain what such a sale would otherwise be. In addition, because the language of MCL 460.1091 does not use the phrase "retail" but includes the same percentages of revenue as those included in MCL 460.1089(7), and the sales of transportation services are to end user customers, we conclude that these services are intended to be viewed as retail sales.

[6] A similar conclusion could be made regarding the savings targets outlined in MCL 460.1077. The PSC's December 23, 2008 order clarified that these targets include sales volumes that include both choice and transportation sales volumes.

[7] With regard to ABATE's argument that it will not be able to participate in any of the benefit programs, Consumers correctly notes that ABATE acknowledges that gas transportation customers will be eligible to participate in and receive benefits from the energy optimization programs developed by the utilities, a fact that the PSC recognized in its order. ABATE's assertion as to the amount of the benefits its members will receive, and

whether these benefits would run afoul of the require-
ments in MCL 460.1071(3)(d), is speculative.

ABATE has raised nothing new in the instant appeal
to challenge this analysis. Most pertinently, while
ABATE continues to complain that gas transportation
customers will not benefit from participation in the
energy optimization plans, and in particular from Con-
sumers Energy's plan, it has still failed to provide any
underlying testimony or evidence to support this asser-
tion. ABATE's expert testified only about the language
of the relevant statutory provisions. In contrast, Ter-
rence J. Mierzwa testified for Consumers Energy that
the gas transportation customers would be able to
participate in Consumers Energy's nonresidential pro-
grams and that their participation would be tracked:

> *Q.* How will the Company ensure, to the extent feasible,
> that charges collected from a particular customer rate class
> are spent on energy optimization programs for that rate
> class?
>
> *A.* Each proposed EO program has a proposed individual
> budget. Customers of different classes are only eligible to
> participate in certain programs. Total spending on residen-
> tial programs will be tracked and monitored to ensure it
> doesn't exceed what is collected from residential custom-
> ers. Similarly, total spending on non-residential programs
> will be tracked and monitored by customer class (primary
> electric, secondary electric, *and transportation gas*) to
> ensure it doesn't exceed what is collected from non-
> residential customers. My understanding is that 2008 PA
> 295 requires all customer classes to fund a proportionate
> share of the cost of the residential low-income programs,
> and the Company has designed its plan accordingly. [Em-
> phasis added.]

Those energy optimization programs were also de-
scribed in considerable detail in Consumers Energy's

energy optimization plan, which Mierzwa sponsored. Especially given ABATE's acknowledgement on appeal that its members will receive some benefit for participation and its citation to testimony that these incentive programs will be available, we find ABATE's argument unpersuasive.

Accordingly, we concur with this Court's decision in *In re Temporary Order to Implement 2008 PA 295* and conclude that the Legislature intended gas transportation customers to participate in Consumers Energy's energy optimization plan.

### III. EXEMPTION UNDER MCL 460.1093(1)

ABATE next argues that the PSC erroneously construed former MCL 460.1093(1), which provided that "an eligible primary or secondary electric customer" is exempt from charges that the customer would otherwise incur under MCL 460.1089 and MCL 460.1091 if the customer files a self-directed energy optimization plan with its electric provider and implements the plan.[12] ABATE contends that the PSC improperly found that this exemption only applies to surcharges from electric providers, despite the fact that MCL 460.1089 and MCL 460.1091 provide for electric and gas utilities to collect gas and energy optimization program costs. But because ABATE did not raise this issue in its initial brief or in its reply brief below in this case, it is not preserved for appeal. *Adam v Sylvan Glynn Golf Course*, 197 Mich App 95, 98; 494 NW2d 791 (1992). Nevertheless, because we agree with it, we reiterate the following analysis from *In re Temporary Order to Implement 2008 PA 295*:

---

[12] As discussed further later in this opinion, this provision was amended by 2010 PA 269, effective December 14, 2010.

ABATE next argues that the PSC erroneously construed the language of MCL 460.1093(1), when it determined that an "eligible electric customer" could still be responsible for surcharges relating to the customer's natural gas provider's energy optimization plan, even if it filed a self-directed electrical energy optimization plan with its electric provider. We disagree.

As a counterpart to MCL 460.1089 and MCL 460.1091, MCL 460.1093 provides an opportunity for certain electric customers to file a self-directed electric optimization plan. MCL 460.1093(2) defines eligibility based on the peak demand of the customer's facility or facilities. MCL 460.1093(1), the subject of the instant dispute, provides for exemption of the requirements and responsibilities the customer would otherwise have under the energy optimization plan of its provider, or as ABATE argues providers, under MCL 460.1089, or the provider or providers' "independent energy optimization program administrator" under MCL 460.1091. [Former] MCL 460.1093(1) provide[d]:

"An eligible primary or secondary electric customer is exempt from charges the customer would otherwise incur under section 89 or 91 if the customer files with its electric provider and implements a self-directed energy optimization plan as provided in this section."

At issue is whether an eligible electric customer, who files a self-directed energy optimization plan with its electric provider is exempt from the surcharges of only its electric provider under MCL 460.1089 or MCL 460.1091 or from both its gas and electric providers under those subsections.

The PSC found that the Legislature did not have this intent, holding that it was highly unlikely that the Legislature would have, in a section of the Act dealing explicitly with electric customers who file self-directed electric energy optimization plans, provided a loophole by which an electric sales customer who elects to do a self-directed electric program can avoid not only the electric surcharge, but also any gas surcharges assessed to gas sales customers. In holding that a customer is an electric customer only

when purchasing electric service, the PSC determined that the charges referenced in MCL 460.1093(1) are therefore limited to charges for electric service that would otherwise be applicable.

We find the PSC's rationale persuasive. The phrase "is exempt from charges the customer would otherwise incur under section 89 or 91" is to be read in context with the remaining portions of MCL 460.1093, as well as the remaining portions of the Act. *Robinson*, 486 Mich at 15. The purpose of MCL 460.1089 and MCL 460.1091 is to provide alternative forms of provider-based energy optimization plans, and provide coverage for the cost of funding the plans. A self-directed energy plan obviates the need for the customer to participate in its electric provider's optimization plan, and effectively replaces it. See MCL 460.1093(7).[8] Thus, the "charges the customer would otherwise incur under [MCL 460.1089 or MCL 460.1091]" in this situation refers to the customer's electric optimization plan costs. Or, as stated by the PSC, a customer is an electric customer with respect to electric charges, and a gas customer with respect to gas charges.

The PSC's decision that the Legislature did not intend MCL 460.1093(1) to exempt the customers who file a self-directed energy optimization plan from all surcharges, whether gas or electric-related, they would otherwise incur under MCL 460.1089 or MCL 460.1091 is further supported by the language of [former] MCL 460.1093(4)(c).[13] This provision, which also pertains to customers who file a self-directed energy optimization plan, requires the PSC to "[p]rovide a mechanism to cover the costs of the low income energy optimization program under [MCL 460.1089]." This program is found in MCL 460.1089(5), discussed above. Thus, reading MCL 460.1093(1) in conjunction with [former] MCL 460.1093(4)(c), we conclude that the Legislature did not intend for the filing of an electric self-directed energy optimization plan to serve as a blanket exemption from all of the other surcharges in MCL 460.1089 or MCL 460.1091. Notably, ABATE does not

---

[13] This language is now contained in MCL 460.1093(5)(c).

challenge on appeal the PSC's imposition of the "cost associated with the allocated portion for the provider's low income residential energy optimization program" on self-directed optimization plan customers. Accordingly, reading the language of MCL 460.1093(1) as a whole in conjunction with the remainder of MCL 460.1093, and the other provisions of the Act, we hold that ABATE has failed to show that the PSC's decision was unlawful or unreasonable.

---

[8] This section[14] provides:

"Once a customer begins to implement a self-directed plan at a site covered by the self-directed plan, that site is exempt from energy optimization program charges under section 89 or 91 and is not eligible to participate in the relevant electric provider's energy optimization programs."

---

[*In re Temporary Order to Implement 2008 PA 295*, unpub op at 7-9 (second and fourth alterations in original).]

Moreover, we also note that, in addition to other amendments to MCL 460.1093, the Legislature has since amended MCL 460.1093(1), which now provides, in pertinent part, "An eligible electric customer is exempt from charges the customer would otherwise incur *as an electric customer* under section 89 or 91 if the customer files with its electric provider and implements a self-directed energy optimization plan as provided in this section." (Emphasis added.) This amendment supports the above analysis concerning the Legislature's intent.

Accordingly, the PSC correctly decided that former MCL 460.1093(1) only allows exemption for eligible electric customers from their electric providers' energy optimization plan charges but not their gas providers' optimization plan charges.

---

[14] This language is now contained in MCL 460.1093(8).

### IV. NINETY-DAY REVIEW PERIOD

The Act requires that the PSC approve energy optimization plans, and renewable energy plans, within 90 days after the utility/provider files its application. As it argued in *In re Temporary Order to Implement 2008 PA 295*, ABATE maintains that this tight time frame and the orders of the PSC setting the schedules for this and other cases violated customers' rights under the Michigan Administrative Procedures Act (APA) and the Michigan Constitution. While we note that ABATE failed to raise this issue below, we will address it. We again find the previous analysis this Court applied in *In re Temporary Order to Implement 2008 PA 295* persuasive and adopt it:

> MCL 460.1021(5) provides:
>
> "The commission shall conduct a contested case hearing on the proposed plan filed under subsection (2),[15] pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328. If a renewable energy generator files a petition to intervene in the contested case in the manner prescribed by the commission's rules for interventions generally, the commission shall grant the petition. Subject to subsections (6) and (10), after the hearing and within 90 days after the proposed plan is filed with the commission, the commission shall approve, with any changes consented to by the electric provider, or reject the plan."
>
> As noted by ABATE, MCL 460.6a(1) provides in pertinent part that, in certain proceedings before the PSC, "the effect of which will be to increase the cost of services to [the

---

[15] MCL 460.1021(2) provides that each electric provider shall file a proposed renewable energy plan within 90 days after the PSC issues its temporary order. MCL 460.1073(1) in turn provides, "A provider's energy optimization plan shall be filed, reviewed and approved or rejected by the [PSC] and enforced subject to the same procedures that apply to a renewable energy plan."

gas or electric utility] customers," interested parties are
entitled to notice and a [sic] "a reasonable opportunity for
a full and complete hearing." Pursuant to MCL
460.6a(2)(a), a " '[f]ull and complete hearing' means a
hearing that provides interested parties a reasonable op-
portunity to present and cross-examine evidence and
present arguments relevant to the specific element or
elements of the request that are the subject of the hear-
ing."

Here, even to the extent that ABATE is correct in its
assertion that it, or other customers, are entitled to this
procedure, it cannot show that the PSC's actions were
improper. ABATE notes that our Supreme Court has held
that the PSC should provide for a "full and complete
hearing" to even procedures for interim rate relief, see
*ABATE v Mich Public Service Comm*, 430 Mich 33, 36,
42-43; 420 NW2d 81 (1988), and argues that parties are
entitled to these procedures in energy optimization plan
proceedings. However, it ignores the Supreme Court's
concurrent holding that, even in such a case, "[t]he PSC
also retains discretion to define the standards upon which
it bases a grant of interim relief, to define what issues and
factors, in a given case, are relevant to those standards as
opposed to the standards for final relief, and to limit
evidence to the written form." *Id*. at 36. See also *id*. at
43-44. Thus, the PSC retains the ability to narrow the
issues in rate optimization plan proceedings, and the
relevant evidence, accordingly.

In its denial of ABATE's motion for rehearing or recon-
sideration, the PSC stated the Legislature intended to
expedite energy optimization plan cases and thus only
issues that are germane to the questions before the PSC
should be entertained at the hearing. It further found that
following the procedures set forth in the orders would not
violate any party's rights because they provide for notice,
opportunity for intervention, offering evidence, cross-
examining evidence presented by others, and presenting
arguments.

ABATE has not offered evidence to show that the PSC's
decision was unreasonable or unlawful, or that it has failed

to provide a reasonable opportunity for a full hearing in energy optimization plan cases. ABATE's argument minimizes the fact that the Legislature, not the PSC, set forth the ninety-day plan review timeframe here. Essentially, through the language of MCL 460.1021(5), the Legislature has determined that, as to the review of energy optimization or renewable energy plans, ninety days presents a "reasonable opportunity to present and cross[-]examine evidence and present arguments relevant to the specific element or elements of the requests that are subject to the hearing" under MCL 460.6a(2). And while ABATE argues that the PSC improperly informed the Legislature that such a timeframe was feasible, or at least did not inform the Legislature that the timeframe would present a problem, it does not provide support for this assertion.

As to ABATE's claims that the ninety-day window violates customers' due process rights under the Michigan Constitution, ABATE cites solely to Const 1963, art 6, § 28. It provides no analysis of its claims that the Legislature's actions violated its members' constitutional rights and no case law to support its assertions. "It is not sufficient for a party 'simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.' " *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998), quoting *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). "Failure to brief a question on appeal is tantamount to abandoning it." *Mitcham*, 355 Mich at 203.

In addition, ABATE essentially seeks declaratory relief concerning an alleged due process violation that has not yet occurred. ABATE asserts that the ninety-day window is insufficient to present and cross-examine evidence, but has not demonstrated this to be the case by providing particulars concerning what, if any, evidence, testimony, argument or other matter it was not permitted to introduce or cross-examine in optimization plan cases as a result of the ninety-day period.

. . . We thus hold that ABATE has failed to demonstrate that the PSC's decision to adopt procedures consistent with the time frame set forth in MCL 460.1021(5) was unreasonable or unlawful. [*In re Temporary Order to Implement 2008 PA 295*, unpub op at 10-12 (alterations in original).]

ABATE's arguments in this case are essentially the same as those raised in its appeal from the initial temporary order. It again cites Const 1963, art 6, § 28, without any further discussion. And while it now has at least participated in a number of energy optimization cases, it provides nothing to show that the time limits imposed by MCL 460.1021(5) have actually prejudiced it or its members. ABATE has not, for example, cited any expert testimony it could not procure in time or any discovery it tried to engage in that it could not. As the PSC notes, ABATE did participate in these cases and filed both an initial brief and a reply brief. In addition to the claims raised in this appeal, ABATE specifically challenged the prudence of Consumers Energy's plan to construct additional wind power capacity as discussed below, argued that Consumers Energy's energy optimization plan charges were too high in general considering that Consumers Energy would not spend the front-loaded surcharges until years later when the expenditures would actually exceed the surcharges for the particular year, and argued that the PSC should reject Consumers Energy's proposed incentive plan whereby the PSC would pay Consumers Energy an annual incentive payment based on excess energy savings over the Act's mandatory statutory targets. ABATE has not yet produced anything concrete to show that it or its members lost protections under the APA or the Constitution.

In summary, we conclude that ABATE has not met its burden of showing that the PSC's adoption of the time frame set out in MCL 460.1021(5) was unlawful or unreasonable.

V. APPROVAL OF CONSUMERS ENERGY'S RENEWABLE ENERGY PLAN

ABATE next challenges the PSC's approval of Consumers Energy's renewable energy plan. Specifically, ABATE continues its arguments raised during the proceeding below that Consumers Energy's calculated costs for building 450 MW of wind capacity and purchasing additional wind capacity were speculative and inflated. Challenging both Consumers Energy's wind capacity factor and the lack of actual data to support a finding that the plants could contribute to Consumers Energy's capacity during peak demand times, ABATE urges us to find that the record does not support the PSC's decision to approve Consumers Energy's plan and that the PSC's decision is thus improper because it is not supported by competent, material, and substantial evidence on the whole record. We decline to do so.

In general, the PSC has wide latitude when choosing whether to credit expert witness testimony in a PSC case. " 'It is for the PSC to weigh conflicting opinion testimony of the qualified ("competent") experts to determine how the evidence preponderated. Expert opinion testimony is "substantial" if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree.' " *North Mich Land & Oil Corp v Pub Serv Comm*, 211 Mich App 424, 439; 536 NW2d 259 (1995), quoting *Antrim Resources v Pub Serv Comm*, 179 Mich App 603, 620; 446 NW2d 515 (1989). Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 685; 658 NW2d 849 (2003), citing *Mich Ed Ass'n Political Action Comm v Secretary of State*, 241 Mich App 432, 444; 616 NW2d 234 (2000). "The testimony of even one expert can be 'substantial' evidence in a PSC case." *Lansing Mayor v Pub Serv Comm*, 257 Mich App 1, 21; 666 NW2d 298

(2003), citing *Mich Intra-State Motor Tariff Bureau, Inc v Pub Serv Comm*, 200 Mich App 381, 388; 504 NW2d 677 (1993).

MCL 460.1021(6) provides, in pertinent part:

> The commission shall not approve an electric provider's [proposed renewable energy plan] unless the commission determines both of the following:
>
> (a) That the plan is reasonable and prudent. In making this determination, the commission shall take into consideration projected costs and whether or not projected costs included in prior plans were exceeded.
>
> (b) That the life-cycle cost of renewable energy acquired or generated under the plan less the projected life-cycle net savings associated with the provider's energy optimization plan does not exceed the expected life-cycle cost of electricity generated by a new conventional coal-fired facility.

In this case, with respect to approval of Consumers Energy's renewable energy plan involving the proposed construction of self-generation wind-power facilities, the PSC made the following findings:

> Most parties in the case contend that Consumers' cost projections are significantly inflated, pointing to Detroit Edison's projected cost of $108 per MWh submitted in that company's REP in Case No. U-15806 and noting that providers in other states have paid less than $100 per MWh for wind energy. The Environmental Coalition asserts that these high costs result from Consumers' estimated capacity factor of 28% and capacity credit of 12.5%, which it contends are far too low.
>
> The Commission agrees that Consumers' estimate for the cost of wind power may be too high, but notes that the components Consumers used to calculate the cost—such as the wind capacity factor—are derived from reasonable sources. The Commission observes that Detroit Edison used a different method for establishing its cost estimate and made different assumptions in its plan. For example,

Detroit Edison made the reasonable assumption that the federal production tax credit (PTC) will be renewed thus lowering the estimated cost of renewable energy by $30-$40 per MWh from Consumers' estimate. Conversely, Consumers made the also reasonable assumption that the PTC will not continue beyond 2012, thus deriving a higher estimated cost for renewable energy. Detroit Edison used a higher capacity factor than Consumers in its calculations, reducing its estimated costs an additional $15-$20 per MWh below Consumers' estimate. But as Consumers points out, as more data, particularly site-specific data, on wind capacity is acquired the company will be required to adjust the estimates in its EOP. Likewise, if the PTC is renewed in 2012, Consumers' REP will be adjusted to reflect this incentive.

In discussing the concerns raised by ABATE and the other parties, the PSC further held:

> The Commission agrees that many of these concerns are compelling and that it would be prudent for Consumers to take the concerns of, and recommendations by, the intervenors into consideration in designing its RFP and bidding process. *The Commission reiterates that in approving this plan, it is not approving any actual costs.* All actual costs incurred for PPAs or self-build renewable generation are subject to Commission review for reasonableness and prudence. Moreover, the Commission will have the advantage of knowing not only what Consumers proposes to spend, but also what other Michigan utilities are proposing to pay for renewable generation equipment and PPAs. Detroit Edison's recently approved contract is a case in point. Detroit Edison received Commission approval to pay $115 per MWh for 20 years for wind energy, capacity, and RECs. *A PPA that proposes a substantially higher price may not be approved by the Commission on grounds that it is unreasonable. Likewise, cost recovery for self-build renewable generation will be carefully reviewed in a contested case before Commission approval.*

> The Commission agrees with the Staff's recommendation that a future docket should be opened to track costs of

various renewable energy systems and components, to provide information for determining reasonable and prudent expenditures. The Commission also directs the Staff to provide oversight and consultation during the RFP development and design process, including proposal evaluation, to ensure that the RFP process is competitive and fair and that the process generates optimal results. [Emphasis added.]

The PSC further expressed concerns with the depreciation schedule that Consumers Energy had proposed for its wind generation facilities and stated that it would open a depreciation case to specifically address depreciation of renewable energy facilities and that the case would be completed before Consumers Energy submitted its next renewable energy plan.

We conclude that the PSC's findings are supported by testimony and exhibits contained in the record and that appellant has thus failed to demonstrate that the decision to allow Consumers Energy to proceed with its renewable energy plan was unreasonable or unlawful. As discussed above, as part of the Act, Consumers Energy and other energy companies were required to enact renewable energy plans, and the PSC was expressly given the responsibility of reviewing those plans. MCL 460.1021; MCL 460.1027(3). The Act also specifically allows, as a part of a renewable energy plan, that the company can meet up to 50 percent of its renewable energy obligation by constructing its own renewable energy facilities. MCL 460.1033(1)(a). The surcharges sought by Consumers Energy, and the lower ones actually approved by the PSC, fall under the maximum allowable under the Act. MCL 460.1021(3); MCL 460.1045. Contrary to ABATE's expert's contention below that Consumers Energy's plan improperly allowed the company to hold initially over-collected revenue, the Act provides for this action, MCL

460.1047(3), and Staff argued that an early collection of revenue best furthered the purposes of the act. The PSC properly took into account various concerns about the size of Consumers Energy's initial reserve fund, among other considerations including the respective burden on residential ratepayers, and modified the initial surcharge on the residential ratepayers. Thus, subject to satisfying the requirements of MCL 460.1021(6), the PSC's approval of Consumers Energy's plan is otherwise reasonable, lawful, and prudent.

Expert witnesses testifying on behalf of Consumers Energy and the National Resources Defense Council testified that Consumers Energy's plan met the requirements in MCL 460.1021(6)(b). Thus, record evidence supports the PSC's decision with respect to the requirements of that subdivision.

With respect to reasonableness and prudence under MCL 460.1021(6)(a), even setting aside the apparent inconsistency in ABATE's position on appeal to challenge only the PSC's decision concerning the self-generation portion of Consumers Energy's plan, which has a lower estimated $/MWh than the PPA portion of the plan, we find sufficient evidence supported the PSC's decision to approve the plan with conditions designed to enable continued review of actual costs in such a manner as to make sure they were reasonable. Consumers Energy's witnesses David Ronk, Jr., and Thomas Swartz testified concerning both Consumers Energy's calculated REC requirements and the reasons for its proposal to build capacity and enter into PPAs with other companies. Both testified that although Consumers Energy did not initially need all of the power capacity it planned to build, it could sell the RECs to other companies.[16] In addition, Swartz

---

[16] Regarding late-filed objections that the calculation of monies generated by Consumers Energy's sale of RECs was overstated, the PSC found

testified about the other reasons for Consumers Energy's decision to build its own facilities, including concerns about the risk of REC unavailability and the downward pressure on pricing as a result of competition. The PSC was free to credit this testimony as rational and valid irrespective of whether other experts disagreed. *North Mich Land & Oil Corp*, 211 Mich App at 439.

With regard to the actual cost estimates that Consumers Energy produced, the PSC was well within its discretion to find that, while some of Consumers Energy's estimates would likely be inaccurate, the plan should still be approved. Staff witness Stanton testified that he found no basis not to approve the plan. Staff agreed with Selecky's recommendation that the PSC use a future docket to explore the reasonableness of costs. The PSC took these concerns into account in ordering the opening of a separate case to address the proper rate of depreciation, and another case to track the costs of "various renewable energy systems and components, to provide information for determining reasonable and prudent expenditures."

Contrary to its argument on appeal, ABATE has not shown that the PSC's order improperly amounted to an abrogation of its present duties under the Act to review Consumers Energy's renewable energy plan for reasonableness. Instead, the PSC recognized that certain of the calculated cost values, including the amount of percentage capacity that the turbines would realize, were necessarily preliminary ones given the nature of the variables. The PSC addressed this uncertainty by

---

that there was insufficient evidence in the record to demonstrate that Consumers Energy's estimate was incorrect, declined to address the issue further, and stated that it expected the estimate would be more precisely determined in Consumers Energy's next REP filing in two years. ABATE does not specifically challenge this decision.

the opening of the "depreciation" and "costs" dockets as noted earlier. In addition, apparently in response to other criticisms by Staff and others concerning Consumers Energy's motives for artificially inflating the proposed costs, and its process for obtaining requests for proposals (i.e., bids) from its suppliers, the PSC ordered Staff to provide oversight and consultation during the development process and over Consumers Energy's bidding process "to ensure that the RFP process is competitive and fair and that the process generates optimal results." Finally, as noted by Staff, the PSC did not approve Consumers Energy's actual costs, but instead required Consumers Energy to return to the PSC when it actually sought to have a contract to procure renewable energy approved, and in annual reconciliations.[17] Thus, contrary to ABATE's arguments, the PSC's review of Consumers Energy's plan, and its enactment, are ongoing. The PSC is not sitting on its hands waiting to approve whatever costs Consumers Energy reports during the later review period.[18]

In contrast, we find ABATE's position unreasonable. ABATE essentially would require Consumers Energy to rely on historical data, such as line loss, an actual measured wind capacity factor, and actual peak and off-peak capacity data, for a project that is not yet built, in order to arrive at a more accurate cost estimate for the project before it can be approved.

---

[17] While not strictly before this Court because the actions occurred after the order complained of in the instant case, on this point we note that the PSC has issued subsequent orders approving PPA and self-generation wind power contracts, for less than Consumers Energy's estimated $/MWh, which demonstrates the PSC's intent to continue to review the actual costs contained in these contracts to ensure that they are reasonable.

[18] We note that the PSC ordered Consumers Energy to file its first reconciliation case on or before March 31, 2010.

In light of the evidence presented, we conclude that ABATE has not demonstrated by clear and satisfactory evidence that the PSC's decision to approve the portion of Consumers Energy's renewable energy plan allowing it to self-build 450 MW of wind generation facilities was unlawful or unreasonable. MCL 462.26(8).

We affirm.

FITZGERALD and SHAPIRO, JJ., concurred with MARKEY, P.J.