# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Application of UPPER PENINSULA POWER
COMPANY to Increase Rates.

CITIZENS AGAINST RATE EXCESS,

      Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION
and UPPER PENINSULA POWER COMPANY,

      Appellees.

UNPUBLISHED
May 31, 2018

No. 336949
Public Service Commission
LC No. 00-017895

Before: MURRAY, C.J., and SERVITTO and BOONSTRA, JJ.

PER CURIAM.

Appellant Citizens Against Rate Excess (CARE) appeals as of right the September 8, 2016 order issued by the Michigan Public Service Commission (PSC), approving in part a request by appellee Upper Peninsula Power Company (UPPCO) to increase its rates for retail electric service based on calculations for a projected 2016 "test year"[1] and its representation that it would likely suffer a revenue deficiency for the year. We affirm.

## I. FACTS AND PROCEEDINGS

UPPCO is a Michigan public electric utility that serves approximately 54,000 retail electric customers in the Upper Peninsula counties of Alger, Baraga, Delta, Houghton, Iron, Keweenaw, Marquette, Menominee, Ontonagon, and Schoolcraft. Pertinent to the instant dispute, in 2014, pursuant to PSC approval in PSC Case No. U-17564, all of the common stock of UPPCO was acquired indirectly by Balfour Beatty Infrastructure Partners GP Limited (BBIP) from Integrys Energy Group Inc ("Integrys").

---

[1] The PSC defines a test year as the "starting point for establishing just and reasonable rates for a regulated utility and its customers" where the PSC "establish[es] representative levels of revenues, expenses, rate base, and capital structure for use in the rate-setting formula."

-1-

On September 18, 2015, UPPCO filed an application, with supporting testimony and exhibits, requesting authority to increase its retail electric service rates. UPPCO stated that, in its last rate case for the 2014 test year, the PSC had granted rate relief based on a 10.15% return on common equity and requested a return for the projected test year of 10.75%. On that basis, UPPCO calculated a base rate revenue deficiency of $17,489,261, or $13,155,928 after it offset a revenue credit of $4,333,333 as required by a June 6, 2014 order in PSC Case No. U-17564. UPPCO sought alternative ways of making up its asserted shortfall. It first proposed that it further defer $6,474,616 of forecasted expenses associated with its 2016 transition and pension and benefit costs to spread out the needed rate increases over a longer time period. This would lead to a current rate increase of $6,681,312 annually. Alternatively, if the PSC disallowed the deferment, it sought to increase its rates by $13,155,928 annually.

Initially, following a proposal and hearing, on March 19, 2016, UPPCO self-implemented a rate increase of $6,259,025,[2] pursuant to then MCL 460.6a(1), which it applied through raising the rates of all rate classes by an equal percentage. At the same time, the parties submitted various testimonies and exhibits concerning UPPCO's initial application and an evidentiary hearing was held.

After the evidentiary hearing, the administrative law judge (ALJ) issued a Proposal for Decision (PFD) that recommended approving UPPCO's alternate proposal, along with the PSC Staff's conditions. As a result, UPPCO filed an exception and contested both the requirement to record any future pension expense below $1.7 million as a regulatory liability and the condition it not receive a return on $27.7 million of the $59 million total regulatory pension asset. The company offered another compromise. It sought to include the $27.7 million in its rate base, in return for offering an additional revenue credit of $390,000 each year from the 2016 test year until December 31, 2021. In its reply to UPPCO's exceptions, CARE argued that the PSC should take the ALJ's position that all of the initial conditions proposed by PSC Staff should be imposed, including not allowing UPPCO to receive a rate of return on the $27.7 million. CARE also specifically maintained that a return of the $27.7 million itself was a reasonable exercise of the PSC's ratemaking authority, and objected to a supporting affidavit that UPPCO had introduced to support its other positions. In its reply, the PSC Staff indicated that it did not oppose UPPCO's proposed compromise, and that the proposed credit "mitigates Staff's concerns."

With respect to the issues on appeal, the PSC agreed with UPPCO's reasoning concerning the calculation of power supply cost recovery (PSCR) factors. It stated that it

> is not persuaded that it should deviate from past practice on this issue, because CARE has not provided any evidence showing that it is logical to add [Real Time Market Pricing (RTMP)] customers to the PSCR calculations. RTMP customers are already paying the LMP and are not PSCR customers; thus, pursuant to the

---

[2] The discrepancy between this amount and the $6,474,616 UPPCO initially sought was apparently due to an initial accounting error.

Commission's direction, UPPCO reduces total fuel, purchased power, and transmission O&M costs by RTMP sales and RTMP transmission revenues. . . . Since their energy costs are passed on directly to RTMP customers, these customers are not included in PSCR calculations. UPPCO provided unrefuted evidence showing that it does not "supply energy to the RTMP customer from its generation and purchased power portfolio." 5 Tr 679. The Commission therefore approves the proposed $58.57/MWh PSCR base rate and 1.0623 loss factor.

With respect to the treatment of separate classes of ratepayers, the PSC held:

> The Commission is not persuaded that CARE has presented a superior rate design formula. Rate schedules vary widely in terms of cost causation, and a degree of nuance is required for accurate rate design. A rate formula that relies on a hard and fast floor and ceiling cannot comply with the legislative mandate for cost based rates. Reliance on a total system-wide jurisdictional average cost conflicts with the Commission's duty to examine the actual costs to serve the various classes of customers, and move those classes of customers to cost based rates. MCL 460.11(12).

With respect the treatment of Accumulated Deferred Income Tax (ADIT) balances, the PSC noted the following when it approved UPPCO's proposed rate base:

> After a review of the record, arguments of the parties, and the PFD, the Commission finds that CARE's exceptions should be rejected. As the ALJ found, UPPCO provided ample evidence, both testimony and exhibits, explaining the adjustment to ADIT and support for its contention that the revenue offset approved in the settlement agreement in Case No. U-17564 was intended to mitigate the impact of the ADIT adjustment.

With respect to the recovery of pension costs, the PSC provided a lengthy description of the process that led to the compromise proposal, and provided the following analysis of CARE's objections and its approval of the compromise:

> The Commission also rejects CARE's objections, which seem to confuse the regulatory asset with the expense. CARE appears to have taken the agreed-upon test year expense of approximately $1.7 million and multiplied it by 25 (years) to arrive at a total regulatory asset of $42.5 million, based on the assumption that $1.7 million would be amortized annually for 25 years. This is neither how the total regulatory asset amount is arrived at nor how amortization works. The total regulatory asset is $59 million, which will be amortized over 25 years. The amount that is amortized each year is only one component of the pension expense. The test year pension expense represents an annual amount that is recalculated each year, and that will change in the next rate case.
>
> In general, new ratemaking proposals should be avoided on rebuttal, because the proposal may not be properly fleshed out. In this case, the utility and the Staff have agreed upon an additional customer credit and a set of conditions,

and the Commission finds that the credit and conditions should be approved because they amount to a reasonable outcome for a very specific set of circumstances. The Commission agrees with the ALJ that UPPCO's alternative proposal, which brings the test year pension expense in line with historical pension expenses, is superior to the Staff's proposed expense, which is based on setting pension expense at a level consistent with what was represented by UPPCo in Case No. U-17564. The sale caused the need for the top-up contribution. The Staff has not disputed that the top-up was required under ERISA, nor that UPPCo was required to reimburse Integrys. The spinoff is indisputably the act that changed UPPCo's plan to a retiree-heavy plan, due to the change in the demographics of the employee base - 87% of plan participants are now former employees. 5 Tr 443, 446. However, the settlement agreement provided that there could be no change to employee benefits as a result of the sale.

Given that the sale actually resulted in dramatic changes to the ratio of current to former plan participants, the effects of the sale should be taken into account. Amortizing the expense over a longer period of time will lower the cost to ratepayers during the test year without harming the company. The top-up was a required pension contribution that would, under normal circumstances, be treated as part of working capital. While the Commission recognizes that these circumstances are unprecedented, the Commission also acknowledges that the top-up was required by law and ensured that there would be no change to current or former employees' benefits. Thus, the Commission is not persuaded that it should be removed from rate base. The Commission finds that: (1) UPPCo shall use a test year pension expense of $1.7 million, and shall record any future pension expense below that amount, on a yearly basis, as a regulatory liability; (2) UPPCo shall treat the total $59 million related to pension expense as a regulatory asset, and shall receive a return of and on that amount; and (3) UPPCo shall implement an additional $390,000 revenue credit beginning with the 2016 test year through December 31, 2021.

CARE filed a petition for rehearing. Following replies from UPPCO and the PSC Staff, the PSC denied CARE's petition.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

The following standards apply to this Court's review of PSC decisions:

The standard of review for PSC orders is narrow and well-defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in

the exercise of its judgment. And, of course, an order is unreasonable if it is not supported by the evidence. In sum, a final order of the PSC must be authorized by law and supported by competent, material, and substantial evidence on the whole record.

> An agency's interpretation of a statute, while entitled to respectful consideration, is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue. [*In re Review of Consumers Energy Co Renewable Energy Plan*, 293 Mich App 254, 267-268; 820 NW2d 170 (2011), amended 293 Mich App 801 (2011) (quotation marks and citations omitted).]

With respect to the PSC's factual determinations:

> Judicial review of administrative agency decisions must not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. []When reviewing the decision of an administrative agency for substantial evidence, a court should accept the agency's findings of fact, if they are supported by that quantum of evidence. A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record.[] [*Id.* (quotation marks and citations omitted).]

With respect to CARE's argument that the PSC's order is unreasonable because it is not supported by competent, material, and substantial evidence on the whole record, the following principles apply:

> In general, the PSC has wide latitude when choosing whether to credit expert witness testimony in a PSC case. It is for the PSC to weigh conflicting opinion testimony of the qualified (competent) experts to determine how the evidence preponderated. Expert opinion testimony is substantial if offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree. Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. The testimony of even one expert can be substantial evidence in a PSC case. [*Id.* at 284-285 (quotation marks and citations omitted).]

In addition, the PSC is entitled to consider all lawful elements in determining rates, and is not bound by a single formula or method as it may make pragmatic adjustments when warranted. *In re Application of Consumers Energy Co*, 281 Mich App 352, 360; 761 NW2d 346 (2008).

## B. UPPCO'S CALCULATED BASE RATE

The PSC's decision to approve UPPCO's calculated PSCR rate of $58.57/MWh is supported by expert testimony offered by UPPCO, and CARE has not demonstrated that the PSC's decision to accept UPPCO's calculated PSCR base rate, with line loss factors, was unlawful or unreasonable.

The underlying dispute on this issue involves whether RTMP customers' power use should be included in the calculation of the PSCR base rate. In support of its position, CARE points to language in MCL 460.6j(11) and (12) which, at the time of the instant dispute,[3] provided:

> (11) Not more than 45 days following the last day of each billing month in which a power supply cost recovery factor has been applied to customers' bills, the utility shall file with the commission a detailed statement for that month of the revenues recorded pursuant to the power supply cost recovery factor and the allowance for cost of power supply included in the base rates established in the latest commission order for the utility, and the cost of power supply. The detailed statement shall be in the manner and form prescribed by the commission. The commission shall establish procedures for insuring that the detailed statement is promptly verified and corrected if necessary.

> (12) Not less than once a year, and not later than 3 months after the end of the 12-month period covered by a utility's power supply cost recovery plan, the commission shall commence a proceeding, to be known as a power supply cost reconciliation, as a contested case pursuant to chapter 4 of the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969. Reasonable discovery shall be permitted before and during the reconciliation proceeding in order to assist parties and interested persons in obtaining evidence concerning reconciliation issues including, but not limited to, the reasonableness and prudence of expenditures and the amounts collected pursuant to the clause. At the power supply cost reconciliation the commission shall reconcile the revenues recorded pursuant to the power supply cost recovery factors and the allowance for cost of power supply included in the base rates established in the latest commission order for the utility with the amounts actually expensed and included in the cost of power supply by the utility. The commission shall consider any issue regarding the reasonableness and prudence of expenses for which customers were charged if the issue was not considered adequately at a previously conducted power supply and cost review.

CARE argues that because the PSC approved $48,284,554 as the PSCR base rate, UPPCO was then required to use this figure, along with the total power use of all of its customers, to calculate the base rate. As UPPCO argues, however, its expert, Aaron Wallin, testified that with respect to the RTMP customers, the company did not purchase or generate power for them. Therefore, the portion of the $48,284,554 representing the RTMP customers should be removed when

---

[3] The current version of these provisions, as amended by 2016 PA 341, effective April 20, 2017, is substantially similar.

calculating the base rate, and their power use should also be removed from the "total" power used by all of UPPCO's customers.[4]

As the PSC argues, this concept is supported by the fact that RTMP customers are charged in a different way for UPPCO's service in transmitting power to them from their actual providers. In PSC Case No. U-15224, the PSC approved a tariff for the RTMP customers of UPPCO. The basis for the allowance of the tariff was the PSC's finding that the RTMP customers would not otherwise be responsible for UPPCO's PSCR mechanism:

> UPPCo represents that ex parte approval of the application is appropriate because it will not result in an increase in existing rates or costs of service to existing tariff customers. Because customers taking service under this Program will be subject to actual LMPs, the Program will not be subject to UPPCo's power supply cost recovery mechanism. The Commission agrees that ex parte approval is appropriate, because approval of UPPCo's application will not result in an increase in existing customer rates or charges.

Wallin's testimony comports with that earlier decision. Wallin also testified at length about the reason for the different treatment of the RTMP customers from the PSCR customers. Wallin testified that UPPCO does not have costs associated with generating or purchasing power for the RTMP customers, and that those customers' purchases essentially "pass through" UPPCO's lines. With respect to the assertion of CARE's witness, Jester, that UPPCO was using its own facilities, or purchases, to serve RTMP customers, Wallin pointed to the fact that it purchased 1,940 MWhs more power in the RT or MISO market than it sent to RTMP customers, because it had to purchase additional power for its other customers, to make up for shortfalls in its generation and non-MISO purchases. The PSC was free to believe Wallin's testimony rather than Jester's. *In re Review of Consumers Energy Co Renewable Energy Plan*, 293 Mich App at 268. Because the testimony of even one expert can be "substantial" evidence in a PSC case, *id*. at 284-285, CARE has not shown that the PSC's approval of the $58.57/MWh PSCR base rate was unreasonable.

CARE also appears to confuse or conflate the PSC's initial approval of UPPCO's 2016 "power purchases" with its later rejection of CARE's proposed PSCR base rate and line loss calculations. The PSC did not, as CARE argues, "[approve] recovery of $48,284,554 PSCR expense allowance" for PSCR base rates. It only approved recovery of $35,673,332 in PSCR expenses, after the $12,515,176 representing purchases by the RTMP customers were removed

---

[4] Subtracting $12,515,176 in RTMP sales and transmission from $48,284,554 (or $48,380,940 from Exhibit A-8, line 39) results in $35,769,378. The difference in reduction from the $35,673,332 used by Wallin represents these costs, as well as reductions for costs for "opportunity" sales, "capacity," and "REC" sales, for a total of $12,707,608. Wallin testified that the initially calculated RTMP sales were 240,850 MWhs. During his rebuttal testimony, Wallin stated that the company had 209,984 MWh in RTMP sales.

from the initial figure. Thus, the PSC was not forced to use either this latter amount, or the corresponding 240,850 MWh of power the RTMP customers used, in the PSCR base rate.[5]

CARE's arguments concerning the calculation of the line losses are similarly flawed. As with the PSCR base rate, CARE argues that line losses should be based on the total amount of power transmitted, 814,273 MWh, based on Jester's testimony that because a significant portion of the power delivered to the RTMP customers was provided by UPPCO power supply resources, it was not reasonable to charge all of the power used by UPPCO itself to the PSCR customers. However, Wallin testified that for the same reason he did not include RTMP sales in PSCR base rates, they should not be included in line loss calculations. He maintained that UPPCO did not incur line losses, which he termed "distribution system losses," with RTMP sales, "since the RTMP customer load is served directly from the transmission system." Also, as noted above, in rebuttal to Jester's testimony, Wallin testified that the company purchased more power from the RT or MISO market than it sent to RTMP customers.

In summary, CARE has not demonstrated that the PSC's decision to accept UPPCO's calculated PSCR base rate, with line loss factors, was unlawful or unreasonable. Testimony was presented to support UPPCO's position, the decision to exclude RTMP customers is supported by the PSC's previous order, and CARE has not demonstrated that UPPCO's treatment of RTMP revenues and power use was inconsistent with its expert's testimony.

C. COST OF SERVICE RATES

We likewise reject CARE's argument that the PSC's order approving the cost of service rates for different types of UPPCO's customers was unlawful or unreasonable.

Initially, CARE's arguments below were substantially different from its argument on appeal. In its initial brief, CARE proposed that rate design should be performed based on the relationship of the rate to the total system-wide jurisdictional average price. CARE contended that the average price for each kilowatt-hour (kWh) for each rate class should not exceed 150% of, or be less than 75% of, UPPCO's overall average price of a kWh. Later, in its exceptions to the proposal for decision, CARE did argue that Michigan law requires just and reasonable rates. However, while claiming that it was not advocating that the PSC adopt average rates, it then "recommended capping the average cost resulting from rates proposed in each rate schedule at

_____

[5] We also reject CARE's argument that there is a discrepancy between the "Net PSCR costs" of $35,673,332 in line 48 of Exhibit A-8, and the amounts in lines 2, 6, and 12 of Exhibit A-6, schedule F1.2, p 3, representing a total of $48,284,554 for the operating and maintenance costs for fuel and transmission and the demand cost of fuel. As the PSC notes, line 26 of Exhibit A-6, schedule F1.2, p 2 contains the $12,515,177 representing the revenue collected from RTMP customers. And as shown in the columns from A-1 through Z-4 on line 26, this revenue was allocated from RTMP customers to the other rate class customers. This supports Wallin's assertion that RTMP customers were not being subsidized by other customers. Instead, as Wallin stated, the opposite occurs.

$0.18 per kWh and not allowing the average cost for any rate schedule to fall below $0.09 per kWh" or, as the PSC took this to mean, "that rates be capped . . . such that all rates range from $0.09 to $0.18 per kWh." Although CARE argues on appeal that the PSC's order did not take into account various factors to arrive at a required "reasonable" rate for each customer class, it proposed below actual rate disparity caps. Moreover, in the PSC, CARE did not point to any evidence or testimony to support its proposed rate caps. To the contrary, UPPCO provided substantial expert testimony explaining how it arrived at its proposed rates, how the rates fit within the limitations of MCL 460.11, and the rationale behind the disparities. Because UPPCO's expert testimony was uncontroverted, the PSC was permitted to rely on it and approve UPPCO's proposal. *In re Review of Consumers Energy Co Renewable Energy Plan*, 293 Mich App at 268, 284-285.

With respect to statutory interpretation generally, the Court in *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515; 821 NW2d 117 (2012), stated:

> The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language. The first step in that determination is to review the language of the statute itself. Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. We may consult dictionary definitions to give words their common and ordinary meaning. When given their common and ordinary meaning, the words of a statute provide the most reliable evidence of its intent[.] [Quotation marks and citation omitted.]

CARE cites a number of subsections in MCL 460.11, along with MCL 460.54, MCL 460.557(2), MCL 462.4(a), and MCL 462.22(c), in support of its position that the PSC was required to review ratemaking principles in addition to cost causation. At the relevant time, MCL 460.11(12) provided:

> The commission *shall* approve rates *equal to the cost of providing service* to customers of electric utilities serving less than 1,000,000 retail customers in this state. The rates shall be approved by the commission in each utility's first general rate case filed after passage of 2008 PA 286. If, in the judgment of the commission, the impact of imposing cost of service rates on customers of a utility would have a material impact, the commission may approve an order that implements those rates over a suitable number of years. The commission shall ensure that any impact on rates due to the cost of service requirement in this subsection is not more than 2.5% per year. [Emphasis added.]

Because UPPCO serves fewer than 1,000,000 Michigan retail customers, the PSC was required to approve rates "equal to the cost of providing service to customers" or, as discussed by the parties, "cost-based rates." DeMerritt testified on UPPCO's behalf that the company's cost of service study (COSS) was designed to identify data to be used in designing cost-based rates. When asked to explain the idea behind the COSS, DeMerritt also testified that "[t]he costs that customers become responsible to pay should be those costs that the particular customers caused the utility to incur because of the characteristics of the customers' usage of utility service," and

stated that evaluation of the methodology should be based on "whether it provides a sound rationale or theoretical basis, whether the results reflect cost causation and are representative of the costs of serving different types of customers, as well as the stability of the results over time." Likewise, UPPCO's witness, James M. Beyer, testified that UPPCO's principles when developing rates were to use the COSS, to use "embedded and marginal costs" for guidance, that the rate design should reflect cost of service to the extent practical, and where increases or decreases would be substantial, to moderate the change in rates to "incorporate reasonable rate stability." He testified that the intent of the proposed revenue allocation "provides higher rate increases for schedules in which the existing rate levels do not sufficiently recover the cost of providing service" while having lower rate increases where "the current rates (for that type of customer) exceeds the costs to provide services" in order to "realign and move each of the schedules toward rates that better reflect the cost of providing service, as required by [MCL 460.11(12)]." PSC Staff witness, Charles E. Putnam, provided a similar analysis of UPPCO's plan. The testimony from these witnesses supports the PSC's decision that UPPCO's proposed rate increases would represent a move toward, if not an entire shift toward, the cost-based mandate in MCL 460.11(12). Even CARE's witness acknowledged that, with respect to interruptible customers, any cost of service allocation solely based on interruptibility should not result in increased costs to other customer classes because "[a]ny contrary result clearly indicates a cross-subsidy and is unreasonable and unjust to uninterruptible customers."

Although CARE acknowledges that cost-base rates are required under MCL 460.11(12), it also maintains that the PSC acted improperly when it did not attempt to harmonize and reconcile this provision with related statutes discussing rate reasonableness in order to avoid nullifying language in the related statutes. Specifically, CARE points to MCL 460.11(11) and (14), which at the time of the decision provided:

> (11) Within 2 years of the effective date of the amendatory act that added this subsection, an electric utility serving fewer than 120,000 retail customers in this state may file an application with the commission to modify the cost allocation methods and rate design methods used to set that utility's existing rates. Within 180 days of the effective date of the amendatory act that added this subsection, an electric utility serving 120,000 or more but fewer than 1,000,000 retail customers in this state shall file an application with the commission to modify the cost allocation methods and rate design methods used to set that utility's existing rates. This subsection does not apply to a cooperative electric utility that has elected to become member-regulated under the electric cooperative member-regulation act, 2008 PA 167, MCL 460.31 to 460.39. Upon receipt of an application under this subsection, the commission shall commence a proceeding for that electric utility, limited to examining and implementing any modifications to the cost allocation methods and rate design methods used by that utility. An electric utility's application must meet both of the following conditions:

> (a) Be consistent with the cost of providing service provisions of subsection (12).

> (b) Explore different methods for allocation of production, transmission, distribution, and customer-related costs and overall rate design, based on cost of

service, that support affordable and competitive electric rates for all customer classes.

\* \* \*

(14) An analysis of affordable rates under this section shall include both of the following:

(a) An analysis of rate impacts directly attributable to proposed cost allocation methods, not including expiring costs associated with non-base energy and non-base energy delivery that have, except for an expiring contract described in section 5 of the energy for economic development act of 2010, 2010 PA 297, MCL 460.995, specific statutory time durations.

(b) An analysis of the expected impact overall on customer bills.

CARE uses these subsections to argue that, along with reviewing UPPCO's proposed rates to ensure that the company was moving toward cost-based rates, the PSC was also required to "explore different methods for allocation of production, transmission, distribution and customer-related costs and overall rate design" to analyze the impacts of the rates to see whether the proposed rates would be just and reasonable, affordable, and competitive for all customer classes.

However, these subsections are not applicable. With respect to subsection (11), the requirements come into play only when a utility "[files] an application with the [PSC] to modify the cost allocation methods and rate design methods used to set that utility's existing rates." Here, however, UPPCO was clear that its cost allocation and rate design proposal did not include an application pursuant to subsection (11).

Subsection (14) applies only to "[a]n analysis of affordable rates." This in turn refers to language in subsection (3), which provides:

(3) Within 60 days of [June 17, 2004], the commission shall commence a proceeding for each affected electric utility to examine cost allocation methods and rate design methods used to set rates. In each proceeding, each affected utility shall file within 60 days of the commencement of that proceeding a proposal to modify the existing cost allocation methods and rate design methods that have been used to set existing rates and shall provide notice to all of that utility's customers outlining the proposed cost allocation methods and rate design methods. A proposal filed by an affected electric utility must meet both of the following conditions:

(a) Be consistent with subsection (1), which authorizes the commission to modify the 50-25-25 method of allocating production-related and transmission costs to better ensure rates are equal to the cost of service.

-11-

(b) Explore different methods for allocation of production, transmission, distribution, and customer-related costs and overall rate design, based on cost of service, *that support affordable and competitive electric rates* for all customer classes. [MCL 460.11(3) (emphasis added).]

Similar language is found in subsection (6), which governs the requirements of an ALJ's findings in a proceeding commenced under subsection (3). However, pursuant to subsection (10), which states that "[s]ubsections (1) to (9) apply only to electric utilities with 1,000,000 or more retail customers in this state," neither subsection (3) nor subsection (6) apply in the instant case. CARE's citation to subsection (14) as support for its arguments is thus without merit.

None of the other statutes cited by CARE support its position on appeal. MCL 460.54 vests the PSC with the same ratemaking authority regarding utilities as its predecessor regulatory body had in regard to railroads. MCL 460.557(2) provides that in response to a complaint, the PSC may conduct an investigation and fix the price of electricity charged by the utility. MCL 462.4(a) provides that common carriers are required to furnish adequate services and facilities and that the rates charged should be just and reasonable. And MCL 462.22(c) states that if the PSC believes a rate to be unjust, it may investigate after giving the utility notice. None of these provisions support a conclusion that rates that vary by rate class are inherently unjust or unreasonable.

Moreover, even if CARE is correct in maintaining that rates must be reasonable even while a utility moves toward cost-based pricing under MCL 460.11(12), CARE fails to discuss that the Legislature placed its own specific mandate concerning reasonableness in MCL 460.11(12). Even as a company is required to move toward cost-base rates, it is constrained by the limitation that "[t]he commission shall ensure that any impact on rates due to the cost of service requirement in this subsection is not more than 2.5% per year." MCL 460.11(12). As discussed by Beyer, UPPCO was required to follow the prohibition that no class's rate increase could be more than 2.5 percentage points higher than the overall increase when designing its rate structure, and it did so. The PSC noted that UPPCO's proposal was in line with this limitation, as was the staff's proposal. CARE has not shown that the PSC acted unlawfully when it ensured that UPPCO's proposal followed the Legislature's plainly expressed direction about what constitutes a reasonable rate increase.

In addition, CARE provides only general citations to what it claims are other relevant factors to review, without actually using them to analyze the proposed rate allocations. CARE does not discuss the relative costs of service to provide power to the various customer classes or how this should affect the reasonableness of their gas costs.

Also, as UPPCO argues, CARE's brief does not cite any evidence of record that its own proposed hard-cap rate design would have resulted in rates that are more affordable or "just and reasonable," would more reasonably balance investor and customer interests, or would be consistent with the value of service to customers. Apparently recognizing the lack of any evidence to support its own proposal below, CARE has now abandoned its own proposal in favor of an argument that the PSC's analysis was simply flawed.

Moreover, in its initial brief, CARE included a rate breakdown for UPPCO's different classes of customers. This shows that CARE included the rate increases for the RTMP customers in its breakdown of the rate increases by customer class, and these customers are not counted in the PSCR mechanism. With respect to the cost-of-service rate allocation, UPPCO's witness testified that CARE's expert likewise improperly included RTMP customers in his calculations. Additionally, it is the RTMP customers who form the lowest average recovery rate of $0.0014/kWh. Therefore, even apart from the relevant statutory language, CARE's underlying calculations concerning rate disparity are flawed.

For these reasons, we conclude that CARE has not met its burden of showing that the PSC's order approving the cost-of-service rates for different types of UPPCO's customers was unlawful or unreasonable.

### D. CASE NO. U-17654 SETTLEMENT AGREEMENT

We also conclude that the PSC did not act unreasonably or unlawfully when it followed the terms of the settlement agreement in PSC Case U-17654, and permitted UPPCO to add the $70 million representing the transferred ADIT to the company's base rate and thus earn a return on it.

Part of the settlement agreement in PSC Case U-17654 provided that, along with the acquisition of UPPCO, the prior ADIT balance would be reset. As an initial matter, the PSC argues that CARE, who was a party to the settlement agreement, should not be permitted to collaterally attack it in the instant case. Conversely, CARE argues that the "Commission was not bound by the fact that for tax purposes Integrys and BBIP elected to treat the transfer of ownership in UPPCO as a taxable sale of assets" when deciding whether to allow UPPCO to recover on the $70 million in the instant case. Both arguments require consideration and application of a portion of the agreement.

An agreement to settle a pending lawsuit is a contract, governed by the legal rules applicable to the construction and interpretation of other contracts. *Kloian v Domino's Pizza*, LLC, 273 Mich App 449, 452; 733 NW2d 766 (2006); *Gramer v Gramer*, 207 Mich App 123, 125; 523 NW2d 861 (1994). "Interpretation of unambiguous and unequivocal contracts is a question of law." *Gramer*, 207 Mich App at 125. The settlement agreement in PSC Case U-17654 provided, in relevant part:

> 8. This Settlement Agreement has been made for the sole and express purpose of recommending approval of the Proposed Transaction in Case No. U-17564 without prejudice to the rights of parties to take new and/or different positions in other proceedings. If the Commission approves this Settlement Agreement without modification, the parties and the Commission shall not make any reference to or use of the Settlement Agreement or the order approving it as a reason, authority, rationale or example for taking any action or position or making any subsequent decision in this case or any other cases or proceedings; provided, however, such reference or use may be made to enforce the Settlement Agreement and order.

The parties discuss *In re Application of Consumers Energy to Increase Electric Rates*, 498 Mich 967; 873 NW2d 108 (2016), in support of their respective arguments. In that case, which concerned the deployment of smart-meter infrastructure, the Supreme Court ruled that issues preserved by a specific reservation made by the Attorney General in the settlement agreement could be subsequently addressed independently from matters that had been previously settled. *In re Application of Consumers Energy to Increase Electric Rates*, 498 Mich 967, 967. It thus remanded the case to this Court to consider the parties' other arguments. *Id*. In that case, however, the Attorney General expressly reserved specific issues for further litigation. Here CARE did not do so, but instead agreed to the sale, and thus the corresponding ADIT treatment. Therefore, *In re Application of Consumers Energy to Increase Electric Rates* is not dispositive.

Even assuming, however, that CARE is not foreclosed from raising a claim concerning the ADIT, CARE's argument that the PSC should not be bound by the settlement agreement is without merit. The portion of the agreement cited by CARE does not refer to any right or obligation of the PSC. In making its argument that the PSC should not follow the agreement, CARE disregards the last phrase of Section 8, which specifically states that the parties and the PSC may "reference" or "use" the agreement "to enforce the Settlement Agreement and order."

Moreover, CARE ignores Section 7 of the agreement, which provides:

> 7. The parties jointly recommend that the Commission issue its Order Adopting Settlement Agreement and resolve this case *with prejudice, granting all required and requested approvals in connection with the Proposed Transaction*.

The PSC did so, issuing an order that states, in pertinent part:

> C. This order is issued pursuant to Section 6q of 2008 PA 286, MCL 460.6q, and provides all required and related approvals in connection with the proposed transfer of ownership and control by [Integrys] to [BBIP] for the purchase of 100% of the capital stock of [UPPCO].

Thus, the PSC specifically approved all of the underlying transactions involved in the sale. Therefore, even if CARE could argue against the position it took in PSC Case No. U-17564 in which it specifically requested that the PSC decide "with prejudice, granting all required and requested approvals in connection with the Proposed Transaction," it was not unreasonable or unlawful for the PSC to follow its earlier clear direction, and thus approve the inclusion in rate base in the instant case that corresponds to the treatment of the ADIT in PSC Case U-17654.

Citing MCL 24.285 and the statute that requires the PSC to consider the whole record in contested cases, CARE next argues, inconsistently, both that the PSC failed to do so, and that it did so and found the evidence lacking as to whether an agreed-upon $26 million offset was designed to reduce the impact of the ADIT treatment on ratepayers. In particular, CARE points to the PSC's discussion of the settlement agreement which also explicitly described the nature of the $26 million credit when discussing UPPCO's argument that the PSC Staff's initial calculation concerning the pension expense was unreasonable because it failed to account for the offset. In disagreeing with UPPCO's argument, the PSC stated:

As an initial matter, the Commission finds that UPPCo is mistaken in its characterization of the credit arrived at in Case No. U-17564. Neither the settlement agreement nor the order in that case state how the amount was arrived at or what the credit was specifically intended to offset.[5]

---

[5] The Commission finds no corroboration in Case No. U-17564, or record evidence in this case to support the ALJ's statement that the pension top-up "is part of the $26,000,000 revenue credit that reduces UPPCO's revenue requirements over 6 years." PFD, p. 97.

---

CARE is correct that this appears to contradict the PSC's later holding that, with respect to the ADIT balance:

As the ALJ found, UPPCo provided ample evidence, both testimony and exhibits, explaining the adjustment to ADIT and support for its contention that the revenue offset approved in the settlement agreement in Case No. U-17564 was intended to mitigate the impact of the ADIT adjustment.

Although the PSC's initial statement could be read as a finding that the earlier settlement agreement and order did not specifically require the PSC to use the $26 million to offset the pension expense, the two provisions appear contradictory. However, UPPCO produced testimony in the instant case and in PSC Case No. U-17564 that the offset was to help mitigate the effect of the ADIT treatment. Specifically, Bradley Johnson, Barbara Siehr, Manz, Robert Keough and Bente Villadsen all testified in case no. U-17564 regarding the ADIT treatment. Therefore, to the extent that the two findings by the PSC in the instant could be read as inconsistent, the PSC did have evidence to support its determination that the record showed that the revenue offset was designed, at least in part, to offset the negative consequences of ADIT account treatment.

Finally, CARE provides no evidence or testimony to support its own position. Instead, it raises a general argument that the ADIT account treatment is somehow unfair to UPPCO's customers. CARE acknowledges that the circumstance of the sale, and corresponding ADIT tax treatment, was legal and within the province of the parties to the sale. It has presented no testimony or other evidence that UPPCO performed an accounting error. CARE essentially wants this Court to find that UPPCO's witnesses are not credible, but witness credibility was for the PSC to decide. Moreover, CARE has presented nothing to support its contention that the PSC could ignore a portion of UPPCO's legitimate rate base, particularly when CARE and the PSC had already agreed to do so.

E. PENSION EXPENSE

We also conclude that the PSC did not act unlawfully or unreasonably when it approved the compromise concerning UPPCO's pension expense.

CARE first appears to argue that the PSC's decision was either not fully explained or was not based on sufficient evidence because two of the documents that UPPCO provided to show

the calculations used to arrive at the 25-year, $1.7 million amortization compromise were not offered into evidence or subject to cross-examination. In its initial brief, UPPCO discussed the compromise proposal that C. Kenneth Vogl and Susan Crimmins Devon had discussed in their rebuttal testimonies concerning the longer amortization of the pension expense. UPPCO also submitted "Attachment B," which it stated reflected "[t]he impact of this alternative proposal on the revenue deficiency in this case." This attachment contains what is essentially both a revised Schedule A-1 (or more accurately a revision of the initial revision to this schedule) and a revised Schedule C-15. The Schedule A-1 was amended to recalculate the deferral of pension and transaction costs of $6,474,616 to reflect only a deferral of transaction costs, or $2,098,126, and to add a pension recovery amount of $1,700,000, and to then update the "adjusted net operating income" from $8,445,662 to $11,122,184 and the "revenue deficiency" from $7,241,555 to $8,937,315. These items, though not previously submitted in table form, were the subject of testimony from both Devon and Vogl. Although the PSC's argument that this did not constitute a new "calculation" seems questionable, Attachment B was not, as CARE suggests, some piece of new evidence or methodology that CARE was unable to cross-examine Devon and Vogl about. In fact, CARE acknowledged as much in its reply brief, stating:

> The proposed increase of $1,700,000 for expense on line 22 in page 1 of Attachment B, which is added to UPPCO's revenue deficiency apparently reflects Mr. Vogl's testimony in which he states the impact of reducing the annual expense by amortizing it over 25 years instead of over 12.5 years yields an additional annual revenue requirement totaling $1,699,279.

Although CARE did note in its reply brief that Attachment B was not submitted into evidence or subjected to cross-examination, it did not object to its use. Rather, it used the figures included in it to argue that the amount of total recovery from the ratepayers over the 25-year amortization schedule would be $42,500,000 for what it calculated to be only $4,644,185 of actual deferred costs, with the rest representing interest in the amount of $37,855,815. In doing so, CARE did not contend that any of the amounts in Attachment B were incorrect, or request further discovery, cross-examination, or other relief. CARE also does not claim on appeal that any of the amounts on Attachment B are incorrect.[6]

Attachment C was first included in UPPCO's exceptions to the PFD. UPPCO had disagreed with the ALJ's adoption of the staff's condition that the company not be permitted to recover any profit on the recovery of the $27.7 million in pension expense. The company wanted to include it in its rate base, and offer an additional revenue credit of $390,000 each year from the 2016 test year until December 31, 2021. Attachment C was included as a summary of this proposal.

---

[6] In addition, CARE's argument that it was unable to cross-examine UPPCO's witnesses about either the compromise plan the company proposed or the items later set out in Attachment B is without merit. CARE's attorney cross-examined both Vogl and Devon at length about this proposal.

In its reply to UPPCO's exceptions, CARE did not object to the use of Attachment C or even mention it. Nor did it claim that any of the calculations contained therein were incorrect, but instead argued that the PSC should take the ALJ's position that all of the initial conditions proposed by staff should be imposed, including disallowing UPPCO to receive a rate of return on the $27.7 million. Moreover, CARE specifically argued that a return of the $27.7 million itself was a reasonable exercise of the PSC's ratemaking authority. Even in its motion for rehearing, while CARE noted that the Attachments had not been admitted, CARE used the calculations therein to support its position that the PSC's analysis of pension expense did not match the amounts in the Attachments. CARE did not argue that Attachment C represented "additional facts" below. As with the use of Attachment B, while this could reasonably be considered a new calculation of sorts, it was due to a new compromise proposal, which the staff also agreed with. As UPPCO maintains, the offering of a rate or credit compromise is not a question of fact that needs to be supported by separate evidence and subject to cross-examination. Also, as with Attachment B, CARE did not contend that any of the amounts in Attachment C were incorrect or were based on incorrect underlying data, or request further discovery, cross-examination, or other relief.

We conclude that CARE's adoption and use of the figures in Attachments B and C qualify as a waiver of the argument that the PSC's reliance on them to make its decision was improper. "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Living Alternatives for the Developmentally Disabled, Inc v Dep't of Mental Health*, 207 Mich App 482, 484; 525 NW2d 466 (1994). Additionally, it is unclear what CARE thinks will change should this Court accede to its request to remand with instructions to the PSC "to precisely and clearly identify more than conclusory findings regarding the amounts for pension expense it is approving." The underlying data is the same, with the attachments created only for convenience. And as discussed, testimony was presented about the reasons behind, and the rationale for, CARE's initial compromise proposal. Even if this "evidence" was excluded and this matter is remanded, CARE has not demonstrated that the PSC would not reach the same conclusion.

CARE also appears to argue that the PSC did not have enough information to make a decision because the testimony by Vogl and Devon was incomplete and they did "not identify or explain the mathematical amounts or formulas used to calculate [the $59 million] amortization amount" or sufficiently tie the initially projected test year $3.9 million expense calculation with the subsequent 25-year, $1.7 million amortization compromise. Specifically CARE argues that, while Vogl compared UPPCO's 2016 pension expense projection totaling $3,907,694 with proposed amortizations over 12.5 or 25 years, and testified the first year of the 25-year amortization would be lower than UPPCO's projected $3,907,694 2016 pension expense, he failed to identify or explain the mathematical amounts or formulas used to calculate this amortization amount, and UPPCO's Schedule C12, which CARE maintains "identifies projected O&M expenses, but . . . does not identify any connection between UPPCO's projected 2016 expenses and $59 million (amortization)." Similarly, CARE maintains that, while Devon testified that the $1.7 million amortization would replace UPPCO's 2016 pension expense totaling $3.9 million with the $1.7 million, and compared the $1.7 million with prior annual pension expense amounts, "[r]eplacing a test year $3.9 million expense calculation with a 25-year, $1.7 million amortization is not the same."

This argument, which was not raised below and therefore is unpreserved, amounts to a complaint that the witness's testimony should not be believed. However, underlying all of CARE's convoluted arguments of the line items in the various exhibits is a failure to recognize that it is the PSC's role to find expert testimony credible or incredible. *In re Review of Consumers Energy Co Renewable Energy Plan*, 293 Mich App at 284-285. CARE's counsel extensively cross-examined both witnesses and could have explored this alleged deficiency had he chosen to do so. In addition, because CARE has not demonstrated that the PSC's use of Attachments B or C was improper, this undercuts CARE's argument that Vogl's and Devon's underlying calculations were not presented to the PSC.

CARE also maintains that "[a]t best the results included in the PSC's order are based upon speculation and over-emphasizing UPPCO's interests, fail to balance UPPCO's interests and those of its ratepayers, and fail to consider the overall impact of these decisions on customers." However, before the PSC, CARE acknowledged that the company should be able to recover the $27.7 million, and CARE has not otherwise provided any argument or evidence sufficient to support its position.

Affirmed.


/s/ Christopher M. Murray
/s/ Deborah A. Servitto
/s/ Mark T. Boonstra

-18-